1

2

3

4

5

6

7

8
UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
9
AT TACOMA

10
HERBERT D. EASH, III,

11
             Plaintiff,

12
    v.

13
MICHAEL J. ASTRUE[1], Commissioner of
Social Security,
14

15
             Defendant.

16

CASE NO.    C06-5690RJB-KLS

REPORT AND
RECOMMENDATION

Noted for October 5, 2007

17

18
     Plaintiff, Herbert D. Eash, III, has brought this matter for judicial review of the denial of his

19
application for disability insurance benefits.  This matter has been referred to the undersigned Magistrate

20
Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Magistrates Rule MJR 4(a)(4) and as authorized by

21
Mathews, Secretary of H.E.W. v. Weber, 423 U.S. 261 (1976).  After reviewing the parties' briefs and the

22
remaining record, the undersigned submits the following Report and Recommendation for the Honorable

23
Robert J. Bryan's review.

24
FACTUAL AND PROCEDURAL HISTORY

25
     Plaintiff currently is 37 years old.[2] Tr. 25.  He has a high school diploma, some college education

26

27
    [1]Pursuant to Federal Rule of Civil Procedure 25(d)(1), Michael J. Astrue, who recently became acting Commissioner of Social Security, hereby automatically is substituted for Joanne B. Barnhart.

28
    [2]Plaintiff's date of birth has been redacted in accordance with the General Order of the Court regarding Public Access to Electronic Case Files, pursuant to the official policy on privacy adopted by the Judicial Conference of the United States.

and past work experience as a restaurant manager, a server, an applications tester, a Lotus Notes administrator, a website developer, a store merchandise assembler, and a customer service clerk. Tr. 21, 69, 74, 86, 426.

On August 13, 2003, plaintiff filed an application for disability insurance benefits, alleging disability as of June 5, 2002, due to post traumatic stress disorder ("PTSD"), headaches, problems in both his hands and knees, irritable bowel syndrome, and rhinitis. Tr. 12, 25, 53-55, 68.  His application was denied initially and on reconsideration. Tr. 12, 25-27, 36.  A hearing was held before an administrative law judge ("ALJ") on October 20, 2005, at which plaintiff, represented by counsel, appeared and testified, as did a vocational expert. Tr. 422-73.

On May 25, 2006, the ALJ issued a decision, determining plaintiff to be not disabled, finding specifically in relevant part:

> (1)   at step one of the sequential disability evaluation process,[3] plaintiff had not engaged in substantial gainful activity at any time relevant to the decision;
>
> (2)   at step two, plaintiff had "severe" impairments consisting of an anxiety disorder with features of a personality disorder, obstructive sleep apnea and a history of bilateral carpal tunnel syndrome;
>
> (3)   at step three, none of plaintiff's impairments met or equaled the criteria of any of those listed in 20 C.F.R. Part 404, Subpart P, Appendix 1;
>
> (4)   at step four, plaintiff had the residual functional capacity to perform a modified range of light work, which precluded him from performing his past relevant work; and
>
> (5)   at step five, plaintiff was capable of performing other jobs existing in significant numbers in the national economy.

Tr. 14-22.  Plaintiff's request for review was denied by the Appeals Council on September 30, 2006, making the ALJ's decision the Commissioner's final decision. Tr. 4; 20 C.F.R. § 404.981.

On November 27, 2006, plaintiff filed a complaint in this Court seeking review of the ALJ's decision. (Dkt. #1).  Specifically, plaintiff argues that decision should be reversed and remanded for an award of benefits or, in the alternative, for further administrative proceedings, for the following reasons:

> (a)   the ALJ erred by failing to give great weight to the disability "Rating Decision" for plaintiff issued by the United States Department of Veterans Affairs ("VA");

---

[3]The Commissioner employs a five-step "sequential evaluation process" to determine whether a claimant is disabled. See 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920.  If the claimant is found disabled or not disabled at any particular step, the disability determination is made at that step, and the sequential evaluation process ends. Id.

(b)     the ALJ erred in evaluating the medical opinion evidence in the record regarding plaintiff's mental health impairments;

(c)     the ALJ erred in finding plaintiff's mental health impairments did not meet or equal the criteria of 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.06;

(d)     the ALJ erred in evaluating the lay witness evidence in the record; and

(e)     the ALJ erred in assessing plaintiff's residual functional capacity.

The undersigned agrees the ALJ erred in determining plaintiff to be not disabled, but, for the reasons set forth below, recommends that while the ALJ's decision should be reversed, this matter should be remanded to the Commissioner for further administrative proceedings.  Although plaintiff requests oral argument in this matter, the undersigned finds such argument to be unnecessary here.

<u>DISCUSSION</u>

This Court must uphold the Commissioner's determination that plaintiff is not disabled if the Commissioner applied the proper legal standard and there is substantial evidence in the record as a whole to support the decision.  <u>Hoffman v. Heckler</u>, 785 F.2d 1423, 1425 (9th Cir. 1986).  Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971); <u>Fife v. Heckler</u>, 767 F.2d 1427, 1429 (9th Cir. 1985).  It is more than a scintilla but less than a preponderance.  <u>Sorenson v. Weinberger</u>, 514 F.2d 1112, 1119 n.10 (9th Cir. 1975); <u>Carr v. Sullivan</u>, 772 F. Supp. 522, 524-25 (E.D. Wash. 1991).  If the evidence admits of more than one rational interpretation, the Court must uphold the Commissioner's decision.  <u>Allen v. Heckler</u>, 749 F.2d 577, 579 (9th Cir. 1984).

I.      <u>The ALJ Erred in Evaluating the VA's Rating Decision</u>

Although a determination by the VA about whether a claimant is disabled is not binding on the Social Security Administration ("SSA"), an ALJ must consider that determination in reaching his or her decision.  <u>McCartey v. Massanari</u>, 298 F.3d 1072, 1076 (9th Cir. 2002); 20 C.F.R. § 404.1504.  Further, the ALJ "must ordinarily give great weight to a VA determination of disability."  <u>McCartey</u>, 298 F.3d at 1076.  This is because of "the marked similarity" between the two federal disability programs:

> Both programs serve the same governmental purpose--providing benefits to those unable to work because of a serious disability.  Both programs evaluate a claimant's ability to perform full-time work in the national economy on a sustained and continuing basis; both focus on analyzing a claimant's functional limitations; and both require claimants to present extensive medical documentation in support of their claims. . . .

> Both programs have a detailed regulatory scheme that promotes consistency in adjudication of claims. Both are administered by the federal government, and they share a common incentive to weed out meritless claims. The VA criteria for evaluating disability are very specific and translate easily into SSA's disability framework.

Id. However, "[b]ecause the VA and SSA criteria for determining disability are not identical," the ALJ "may give less weight to a VA disability rating if he gives persuasive, specific, valid reasons for doing so that are supported by the record." Id. (citing Chambliss v. Massanari, 269 F.3d 520, 522 (5th Cir. 2001). Here, the ALJ did not do so.

The record contains a "Rating Decision," dated October 10, 2002, in which the VA found plaintiff to be "30%" disabled due to PTSD incurred in connection with his military service during the Gulf War beginning on September 11, 1998, and "70%" disabled with respect thereto as of January 31, 2001. Tr. 200. Also contained in the record is a letter from the VA, dated February 14, 2003, in which plaintiff was noted to be "paid at the rate of 100% due to unemployability," and that he was 90% disabled as of July 1, 2002, though no indication of the cause of disability or unemployability is provided therein. Tr. 203. With respect to these two documents, the ALJ found as follows:

> The VA rated the claimant 30 percent disabled in September 1998, and 70 percent disabled in January 2001 due to PTSD (Exhibit 4F: 156). On February 14, 2003, The [sic] VA awarded the claimant payments of $2440 per month due to unemployability (Exhibit 4F: 153). While it is true that the claimant has a 100% disability rating from the VA for his impairments (Exhibit 4F: 153-156), their unique disability determination process does not adequately address the factors required for disability under the Social Security Administration's regulations. Therefore, the claimant's disability rating has been considered but not given controlling weight. The treatment records from the VA reflect improvement in his condition less than one year after treatment began.

Tr. 20.

Plaintiff argues the ALJ provided insufficient reasons for not giving "great weight" to the VA's rating decision. The undersigned agrees. As noted above, the ALJ ordinarily must do so, unless the ALJ "gives persuasive, specific, valid reasons" for not doing so "that are supported by the record." McCartey, 298 F.3d at 1076. Here, the ALJ failed to give such reasons. The first reason the ALJ did give for not adopting the VA's determination of disability was because of its "unique" disability determination process, which the ALJ found did not adequately address the factors required for determining disability in the Social Security context. However, as clearly stated by the Ninth Circuit, it is precisely because of the "marked similarity" between the two federal disability programs, that great weight normally must be given to VA determinations of disability. Id.

The ALJ did go on to note that the record reflects plaintiff experienced improvement in his mental health symptoms less than one year after his treatment began.  Be that as it may – and, as explained in further detail below, indeed does appear to be the case, – this still falls far short of the type of persuasive, valid and specific reasons required for giving less wait to the VA's rating decision.  The ALJ fails to make any findings regarding how much plaintiff improved, and to what extent, if any, that improvement reduced the percentages of disability and unemployability found by the VA.  Accordingly, the undersigned finds that the ALJ erred in the reasons she gave for discounting that rating decision, and therefore, on remand, that decision should be re-evaluated in the manner set forth in McCartey.

Plaintiff argues the ALJ should have requested and secured the narrative portion of the VA's rating decision, but has not shown that the ALJ necessarily was required to do so.  See Mayes v. Massanari, 276 F.3d 453, 459 (9th Cir. 2001) (ALJ's duty to further develop record triggered only when there is ambiguous evidence or when record is inadequate to allow for proper evaluation of evidence).  It is not at all clear that the evidence was sufficiently ambiguous or the record inadequate for proper evaluation thereof, or what, if any, further relevant evidence the "narrative portion" would have provided.  The undersigned does note that plaintiff has attached to his reply brief a copy of that portion of the rating decision.  Plaintiff, however, has not made the proper showing in order to get that document before the Court, and thus, for the reasons set forth below, the undersigned will not consider it.

Because this is the first time such evidence has been presented for consideration, either before this Court or during the administrative review process, plaintiff must show both that it is "new" and "material" to determining disability, and that he "had good cause for having failed to produce" it earlier.  Id. at 462 (citing to 42 U.S.C. § 405(g)).  To be material, "the new evidence must bear 'directly and substantially on the matter in dispute.'" Id. (citation omitted).  Further, plaintiff must demonstrate a "reasonable possibility" the new evidence "would have changed the outcome of the administrative hearing." Id. (citation omitted).  To demonstrate "good cause," plaintiff also must show the new evidence "was unavailable earlier." Id. at 463.  Plaintiff, however, has not done so.

The narrative portion of the ratings decision certainly is not "new," as it was issued on October 10, 2002, more than three and a half years prior to the date the ALJ issued her decision.  See Plaintiff's Reply Brief, Exhibit A, p. 1.  Further, while the narrative portion appears to be material, at least in the sense that

1   it bears on the specific issue in dispute here, plaintiff has not shown a reasonable possibility it would have

2   changed the outcome of this matter.  Indeed, the VA notes a "higher evaluation" than 70% disability due to

3   PTSD would not be warranted, unless plaintiff could show a "total occupational and social impairment" as

4   a result of his symptoms, strongly indicating the VA did not consider him to be fully disabled at that time.

5   Id. at p. 2.  Lastly, plaintiff gives no reason why he did not provide this new evidence to the ALJ, or even

6   to the Appeals Council, earlier for their consideration.

7   II.   The ALJ's Evaluation of the Medical Evidence

8       The ALJ is responsible for determining credibility and resolving ambiguities and conflicts in the

9   medical evidence. Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998).  Where the medical evidence in

10  the record is not conclusive, "questions of credibility and resolution of conflicts" are solely the functions

11  of the ALJ. Sample v. Schweiker, 694 F.2d 639, 642 (9th Cir. 1982).  In such cases, "the ALJ's conclusion

12  must be upheld." Morgan v. Commissioner of the Social Security Administration, 169 F.3d 595, 601 (9th

13  Cir. 1999).  Determining whether inconsistencies in the medical evidence "are material (or are in fact

14  inconsistencies at all) and whether certain factors are relevant to discount" the opinions of medical experts

15  "falls within this responsibility." Id. at 603.

16      In resolving questions of credibility and conflicts in the evidence, an ALJ's findings "must be

17  supported by specific, cogent reasons." Reddick, 157 F.3d at 725.  The ALJ can do this "by setting out a

18  detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation

19  thereof, and making findings." Id.  The ALJ also may draw inferences "logically flowing from the

20  evidence." Sample, 694 F.2d at 642.  Further, the Court itself may draw "specific and legitimate inferences

21  from the ALJ's opinion." Magallanes v. Bowen, 881 F.2d 747, 755, (9th Cir. 1989).

22      The ALJ must provide "clear and convincing" reasons for rejecting the uncontradicted opinion of

23  either a treating or examining physician. Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1996).  Even when a

24  treating or examining physician's opinion is contradicted, that opinion "can only be rejected for specific

25  and legitimate reasons that are supported by substantial evidence in the record." Id. at 830-31.  However,

26  the ALJ "need not discuss *all* evidence presented" to him or her. Vincent on Behalf of Vincent v. Heckler,

27  739 F.3d 1393, 1394-95 (9th Cir. 1984) (citation omitted) (emphasis in original).  The ALJ must only

28  explain why "significant probative evidence has been rejected." Id.; see also Cotter v. Harris, 642 F.2d

700, 706-07 (3d Cir. 1981); <u>Garfield v. Schweiker</u>, 732 F.2d 605, 610 (7th Cir. 1984).

In general, more weight is given to a treating physician's opinion than to the opinions of those who do not treat the claimant. <u>Lester</u>, 81 F.3d at 830.  On the other hand, an ALJ need not accept the opinion of a treating physician, "if that opinion is brief, conclusory, and inadequately supported by clinical findings" or "by the record as a whole." <u>Batson v. Commissioner of Social Security Administration</u>, 359 F.3d 1190, 1195 (9th Cir.,2004); <u>Thomas v. Barnhart</u>, 278 F.3d 947, 957 (9th Cir. 2002); <u>Tonapetyan v. Halter</u>, 242 F.3d 1144, 1149 (9th Cir. 2001).  An examining physician's opinion is "entitled to greater weight than the opinion of a nonexamining physician." <u>Lester</u>, 81 F.3d at 830-31.  A non-examining physician's opinion may constitute substantial evidence if "it is consistent with other independent evidence in the record." <u>Id.</u> at 830-31; <u>Tonapetyan</u>, 242 F.3d at 1149.

A.    <u>Dr. Turco</u>

Plaintiff was evaluated by Ronald Turco, M.D., in early July 2002.  Dr. Turco found his thought processes and cognitive functioning to be normal, and noted that he was neither delusional nor psychotic. Tr. 151.  Dr. Turco felt plaintiff was "currently depressed," and might have "some memory difficulties." Tr. 155.  He diagnosed plaintiff with a major depressive disorder with post traumatic stress symptoms, and opined in relevant part with respect to his employability as follows:

> In my opinion Mr. Eash is <u>not</u> capable of working at his job.  He is not likely to be able to return to this job.  He has demonstrated in the past an inability to adapt to jobs of responsibility where expectations are placed on him. . . .
>
> It is interesting to note that somehow he can continue with the computer skills and computer work and yet has difficulties associated with remembering issues in the work place.  This in many respects is a contradiction in terms. . . .
>
> . . . In my opinion the prognosis for Mr. Eash's return to work with the Olive Garden Restaurants is poor and he is not likely to return to any job there.

Tr. 155-56 (emphasis in original).

Plaintiff argues, as he does with respect to the other medical source opinions discussed below, that this opinion shows Dr. Turco did not believe plaintiff could adapt to competitive work. Clearly, though, this is not what Dr. Turco concluded.  Rather, Dr. Turco merely stated that in his opinion, plaintiff likely would not be able to return to work for his former employer.  There is no evidence in the record, however, that such prohibition is inconsistent with the ALJ's assessment of plaintiff's residual functional capacity discussed below, or would prevent him from performing other types of work.  Indeed, Dr. Turco's opinion

1 appears to be in line with the ALJ's findings regarding plaintiff's ability to return to his past relevant work,

2 as the ALJ found he could not do so.  As such, the undersigned finds plaintiff's argument to be without any

3 merit concerning the opinion provided by Dr. Turco.

4         B.     <u>Dr. Matteucci</u>

5       Neal A. Matteucci, M.D., appears to have been plaintiff's primary treating physician.  In late June

6 2002, plaintiff saw Dr. Matteucci primarily "to obtain a continuation of his medical leave of absence from

7 his current employment as a manager of a restaurant." Tr. 291.  He told Dr. Matteucci he believed that "an

8 additional month off of work" would "allow him to sort through his priorities, consider his options, and to

9 allow time for" his "medication to become more effective." <u>Id.</u>  However, the mental status examination

10 was fairly unremarkable, and Dr. Matteucci diagnosed plaintiff with only PTSD "by history," ruling out a

11 diagnosis of major depression due to not fully meeting the criteria therefor. Tr. 294-95.  Nevertheless, Dr.

12 Matteucci assessed him with a global assessment of functioning ("GAF") score of 50, and gave him the

13 additional time off work in light of his "presentation," "clear anxiety," and "strong concern about returning

14 to work in two days," and for "medication adjustments." <u>Id.</u>

15       In early October 2002, plaintiff reported "clear improvement" associated with an increase in his

16 medication, including "improved mood" and a decrease in his irritability and anger. Tr. 278.  In early

17 January 2003, plaintiff further reported that his mood was "'OK' overall." Tr. 274.  In mid-June, and then

18 again in late July 2003, he once more reported that his mood was "'OK' overall," and that the level of his

19 irritability had "clearly decreased." Tr. 263-64.  In mid-August 2003, Dr. Matteucci noticed that plaintiff

20 appeared "to have decided that since" he had received a 100% award of unemployability and the "monthly

21 support" associated therewith, he saw "less need to explore return to work options," but felt "an obligation

22 to completing the training." Tr. 228.  Dr. Matteucci also stated that he had discussed plaintiff's tendency to

23 over-report the degree of his mood fluctuations. <u>Id.</u>

24       In early October 2003, plaintiff reported "doing relatively well overall" and having "no difficulty

25 focusing on school work when studying." Tr. 230.  His mood also was "good" on presentation. <u>Id.</u>  In

26 addition, according to Dr. Matteucci, psychological testing that was conducted indicated "a large number

27 of unusual experiences suggesting the possibility of exaggeration of complaints." Tr. 229.  Other testing

28 suggested the "clear possibility of exaggeration of complaints" as well." <u>Id.</u>  Plaintiff again reported that

he was "doing relatively well overall" in early November 2003, and that he found therapy and medication

to have been "helpful." Tr. 231.  Also, once more, plaintiff's mood was noted to be "OK" on presentation,

and he reported having "no difficulty focusing on school work when studying." Id.

Similar findings were made in early December 2003, as well. Tr. 232-33.  Dr. Matteucci also made

the following comments at that time:

> Discussed form for $6K student loan forgivence [sic].  He remains understanding
> that this provider is unable to sign the form, thereby stating per form text, that there is
> no anticipation he will improve.  Discussed again that there is the expectation that
> improvement will occur.  He states plan to ask neuropsych [sic] evaluator to sign form,
> because "they told me there was no chance I would get better and that the test was
> 100% accurate".  Discussed that this was an unlikely statement to be made by
> neuropsych [sic].

Id.  These comments and substantially similar findings, and reports in terms of the benefits received from

therapy and medication, were repeated in February and March 2004. Tr. 233-34, 403.

Plaintiff continued to report getting benefit from his therapy and medication through December

2004. Tr. 374-75, 377, 396, 401.  Indeed, in early October 2004, Dr. Matteucci told plaintiff he did not

believe that loan forgiveness "based on the provideded [sic] definition of disability . . . appropriate given

his presentation, improvement, current performance in school and future plans." Tr. 377.  In both early and

late March 2005, plaintiff denied having any "acute concerns." Tr. 363.  In mid-July 2005, he reported

benefitting not only from his medication, but also from working out, which he stated helped his mood and

level of agitation. Tr. 354.  A similar report of "clear benefit" from medication was made by him in early

August 2005, as well. Tr. 351.

With respect to the findings and opinions of Dr. Matteucci, the ALJ found as follows:

> [D]uring his initial assessment on June 17, 2002, Dr. Matteucci estimated the
> claimant's global assessment of functioning (GAF) to equal 50, which denotes a serious
> impairment in social and occupational functioning (Exhibit 4F: 62).  However, this
> appears to be inconsistent with the results of the mental status examination included in
> his clinical note, that exam showed intact concentration and memory, and no suicidal or
> homicidal ideation.  Also, the doctor said he would allow the claimant to have an
> additional month off work (Exhibit 4F: 61-62).  This indicates he did not view the
> claimant's condition as indefinitely preventing work.  Dr. Matteucci's follow-up notes
> consistently list the claimant's diagnosis as "rule out" PTSD, based apparently on signs
> of symptom exaggeration on the claimant's part, and inconsistencies in the claimant's
> history (Exhibits 4F: 123, 125, 127, etc.).  Notably, Dr. Matteucci did not provide any
> further estimates of the claimant's GAF.  On October 4, 2004, he opined that the
> claimant's disability was not clear, in light of his presentation, improvement, current
> performance in school and future plans (Exhibit 9F: 236).  This reflects that the
> claimant's condition had improved and the doctor did not view him as totally disabled.

1    Tr. 19.  The undersigned agrees with the ALJ's analysis of the medical opinion evidence contained in the

2    record obtained from Dr. Matteucci.

3        As with Dr. Turco, plaintiff argues Dr. Matteucci believed he could not adapt to competitive work.

4    Clearly this is not the case, however, as Dr. Matteucci, as noted above, gave plaintiff permission to remain

5    off work for a period of at most one month in late June 2002.  As pointed out by the ALJ, furthermore, Dr.

6    Matteucci also noted findings indicative of plaintiff's tendency to exaggerate symptoms, and told plaintiff

7    that he would not sign any document stating plaintiff was permanently disabled, but rather informed him

8    that he expected he would improve.  As such, the undersigned also finds plaintiff's argument with respect

9    to Dr. Matteucci to be without merit.

10        C.    Dr. Monkarsh

11        Plaintiff was evaluated by Gary P. Monkarsh, Ph.D., in late September, 2002.  During the mental

12    status examination, plaintiff was oriented, had clear, coherent and goal-directed speech, and displayed

13    good eye contact. Tr. 218.  While plaintiff admitted to a recent history of suicidal ideation and displayed a

14    flat affect, he denied any history of homicidal or psychotic ideation. Id.  Dr. Monkarsh diagnosed plaintiff

15    with "chronic and severe" PTSD, and noted specifically that he appeared to suffer from an increase in his

16    PTSD symptoms. Id.  He also diagnosed plaintiff with a dysthymic disorder secondary to his PTSD, and

17    assessed him with a GAF score of 45-50. Id.  Finally, Dr. Monkarsh opined that plaintiff appeared to

18    "suffer from severe overall emotional and industrial impairment and moderate to severe social

19    impairment" as a result of his diagnosed conditions and symptoms. Id.

20        Although the ALJ did not specifically address the findings of Dr. Monkarsh, those findings also do

21    not support plaintiff's contention that Dr. Monkarsh believed he was incapable of adapting to competitive

22    work.  Indeed, while Dr. Monkarsh did opine that plaintiff appeared to suffer from severe emotional and

23    industrial impairment, he provided no specific opinion regarding an ability to remain competitive in a

24    work environment.  Nor did Dr. Monkarsh define what he meant by the term "severe."  Nevertheless, since

25    this term does denote, or at least is indicative of, serious mental functional impairment, the undersigned

26    finds the ALJ erred in not addressing this medical opinion evidence.  Accordingly, on remand, re-

27    consideration of such evidence shall be undertaken.

28

1       D.    Dr. Swiercinsky

2       Dennis P. Swiercinsky, Ph.D., conducted an independent neuropsychological examination of

3  plaintiff in late June 2003.  Dr. Swiercinsky noted that while plaintiff's "[g]lobal severity index" indicated

4  "an expressed marked level of overall physical and emotional" self-reported distress, he "did not appear so

5  intensively distressed at any time throughout" the examination. Tr. 188.  Upon examination, plaintiff's eye

6  contact was normal, as was his global thinking, mental processing speed, general alertness, overall rate of

7  response, ability to understand and perform test demands, and ability to maintain stamina and frustration

8  tolerance. Tr. 190-91.  His mood and affect also were adequate, and his working memory and functional

9  intelligence were both normal as well. Tr. 190-94.

10       Although plaintiff's "ability to adapt in social interactions and maintain an appropriate level of

11  maturity" was "at least questionable and probably deficient," Dr. Swiercinsky found "no obvious evidence

12  for any acquired neuropsychological disorder." Tr. 197.  As such, plaintiff demonstrated "no overall

13  deterioration" or "specific cognitive areas that would be correlated with known neurological processes."

14  Tr. 197.  Dr. Swiercinsky did find that plaintiff's "average intellectual capability" was "functionally

15  weakened somewhat by low reading level," and that his anxiety tended "to interfere with performance

16  under timed (stressful) situations." Tr. 198.  Thus, he diagnosed plaintiff with an anxiety disorder and as

17  having the characteristics of a native verbal learning disability. Id.

18       On the other hand, Dr. Swiercinsky noted that plaintiff's "ability to maintain relationships" with

19  co-workers and supervisors might be improving. Id.  Further, Dr. Swiercinsky felt plaintiff's prognosis

20  was "good for improved general performance as he continues with treatment and education through the

21  VA program." Id.  The ALJ, therefore, rightly pointed out that while Dr. Swiercinsky concluded plaintiff's

22  prognosis for improvement was good, he "offered no opinion" regarding his residual functional capacity.

23  Tr. 19.  Accordingly, it is difficult to understand, to say the least, the basis for plaintiff's argument that Dr.

24  Swiercinsky too believed plaintiff could not adapt to competitive work.  Indeed, the undersigned finds that

25  he did not give any such opinion, and that the ALJ did not err in evaluating the findings and opinions Dr.

26  Swiercinsky did provide.

27       E.    Dr. Wittkopp

28       Plaintiff underwent an independent psychiatric evaluation by George F. Wittkopp, M.D., in mid-

July 2003.  Right away, Dr. Wittkopp noted plaintiff was not being entirely truthful in what he was self-reporting. Tr. 157; see also 163, 165, 167.  Dr. Wittkopp also noted those aspects of plaintiff's medical history, in which it was observed that he was focused primarily on obtaining disability and remaining off work. Tr. 159.  Indeed, on formal testing plaintiff "received a moderate elevation on the 'fake bad' scale," which suggested "a willingness to report distressing symptoms if not some tendency to overemphasize or exaggerate them." Tr. 169.

On the other hand, Dr. Wittkopp did find the above testing showed the following:

> The profile indicates intense and unreleased anger and accumulated resentments.  He also has an exquisite sensitivity to criticism.  His responses suggest fixed paranoid projections of his anger and possibly delusional beliefs.  The current level of organization of his day-to-day functioning and immediate practical self-sufficiency tests as severely disorganized and essentially collapsed.

> He tests as severely anxious, tense, fearful, and self-preoccupied.  His anxieties are likely to involve obsessive thinking.  He also tests as depressed, self-negative and self-critical.  Abrupt mood changes are likely.

> The pattern suggests distressing somatic complaints that are either emotional in origin or involve strongly functional elements.  He tests as poorly tolerating frustration and the profile suggests a mild to moderate suicide risk.

Tr. 169-70. On mental status examination, plaintiff also appeared to be "quite anxious," and Dr. Wittkopp found there to be "a prominent thought disorder." Tr. 170.  Specifically, Dr. Wittkopp noted that plaintiff had "a very difficult time putting together a coherent stream of thought." Id.  He was alert and oriented to objective testing, but his fund of knowledge was "somewhat limited." Id.  Insight and judgment also were "both questionable." Id.

Dr. Wittkopp diagnosed plaintiff with a bipolar disorder, a "strongly suspected" attention deficit disorder, an anxiety disorder with "some PTSD symptoms," a "[m]ixed personality trait disturbance" with paranoid, obsessive and dependent features, and a GAF score of 60, indicating "serious impairments in most life spheres including vocational and interpersonal activities." Tr. 172.  Dr. Wittkopp, however, noted that the diagnosis of PTSD was "problematic," and that the severity of plaintiff's depression did not seem to rise to the level of a major depressive disorder. Id.  While plaintiff also appeared "severely disturbed," Dr. Wittkopp noted he had received some benefit from medication. Tr. 173.

In terms of the conflicts in plaintiff's medical history, Dr. Wittkopp stated that although some of them seemed "to result from confusion," some of it "clearly" was "related to outright prevarication." Tr.

171.  Dr. Wittkopp further noted that while plaintiff endorsed "a number of symptoms of PTSD," he did "not spontaneously report them or really complain of them." Id.  He felt plaintiff probably had attention deficit disorder "all of his life," which, superimposed on his bipolar disorder, resulted in "severe mood swings." Id.  In terms of motivation to work, though, Dr. Wittkopp specifically stated that:

> He is obviously very much interested in the compensation issue.  He states he is earning quite a bit more money now than he was working in the restaurant, and he enjoys the fact that it allows him the freedom to do some things such as go to school – even though he knows that this schooling will lead to no productive employment.

Id.  Finally, with respect to his opinions concerning the level of plaintiff's disability and his ability to work and return to work, Dr. Wittkopp commented in relevant part as follows:

> I doubt that he could or would adapt to a situation in the competitive work environment at this point in time.  Now that he is on 100% disability, he has really no motivation to return to work.  He also remains emotionally volatile and labile and would undoubtedly have more conflicts and altercations with coworkers. . . .

> . . . I believe he must be considered totally disabled at this time and for the foreseeable future.

> . . . This [when plaintiff could return to full or modified duty] can not be answered at this time because it depends upon multiple variables including his response to trials of therapy for other diagnoses.  As mentioned above, he has no motivation to return to any sort of work that I can detect at this time.  It is possible that if, indeed, he does have Bipolar Disorder as I strongly suspect, and if that is appropriately treated, he may feel good enough to want to return to work in some fashion.

> . . . I believe that he will always be mentally ill in some way and have to be treated psychiatrically in some way.  To what extent his symptoms can be controlled remains to be seen.

Tr. 173-74.

In regard to Dr. Wittkopp's opinion regarding plaintiff's mental functional capabilities, disability and ability to work, the ALJ found as follows:

> On July 16, 2003, Dr. Wittkopp estimated the claimant's global assessment of functioning (GAF) as 60, which he indicated "denotes serious impairments in most life spheres, including vocational and interpersonal activities" (Exhibit 2F:16).  This is inconsistent because a GAF of 60 is generally used to denote a moderate impairment in social or occupational functioning.  In addition, Dr. Wittkopp opined that the claimant was "totally disabled at this time and for the foreseeable future" (Exhibit 2F:17).  This opinion is inconsistent with the VA treatment records, as well as Dr. Swiercinsky's findings from June 27, 2003, and the undersigned gives it little weight.  It is not objective and appears to be based on subjective complaints.  Since the claimant is not very credible, reliance on his allegations is not persuasive.  It is also noted that Dr. Wittkopp indication [sic] that some of the claimant's reported history was "outright prevarication" (Exhibit 2F:22).  The doctor should have been aware of the claimant's credibility problems.

REPORT AND RECOMMENDATION
Page - 13

Tr. 19-20.  Again, the undersigned finds the ALJ presented valid reasons for not finding the opinion of Dr. Wittkopp regarding the impact of plaintiff's impairments to be as significant as indicated, let alone support a finding of disability.  Indeed, it appears Dr. Wittkopp was well aware of plaintiff's credibility problems and issues with motivation, and seemed to have based his disability opinion to a large degree on this latter factor.  That alone calls into question the reliability of Dr. Wittkopp's opinion.  The undersigned further notes plaintiff has presented no specific argument challenging the ALJ's particular findings on this issue, as he also has failed to do with respect to the other medical sources discussed above.

        F.    <u>Drs. Houck and Lewis</u>

        A psychiatric review technique form was completed by Trevelyn Houck, Ph.D., and Janis Lewis, Ph.D., in mid-November 2003.  Drs. Houck and Lewis diagnosed plaintiff with a learning disorder and PTSD. Tr. 308, 312.  They found plaintiff to be mildly restricted in his activities of daily living and to have moderate difficulties in maintaining social functioning and in maintaining concentration, persistence or pace. Tr. 317.  There was insufficient evidence of episodes of decompensation. <u>Id.</u>  At the same time, Dr. Houck and Dr. Lewis completed a mental residual functional capacity assessment form, in which they also found plaintiff to be moderately limited in his ability to: understand, remember and carry out detailed instructions; maintain attention and concentration; complete a normal workday and workweek, perform at a consistent pace; interact appropriately with the general public; and get along with co-workers or peers. Tr. 321-22.  Lastly, Drs. Houck and Lewis commented that plaintiff could "complete semi-skilled and some skilled tasks" with "adequate attention to complete" a workday and workweek, and that he would "do best with a few co-workers and limited public contact." Tr. 323.

        The ALJ summarized the findings of Dr. Houck and Dr. Lewis in her decision, and stated that while she disagreed with "some aspects" of their determination, she agreed with their "general conclusion" that plaintiff was "capable of simple and some detailed tasks" not involving "extensive social interaction." Tr. 20.  Plaintiff argues the ALJ failed to provide any explanation as to why she did not adopt any of the other moderate limitations found by Drs. Houck and Lewis.  The undersigned agrees to a degree.  At the outset, however, it must be noted that the undersigned finds no error with the ALJ's determination that plaintiff was capable of performing simple and some detailed tasks not involving extensive social interaction, and that, in this sense, the ALJ did adopt most of the above two psychologists' limitations.

For example, a restriction to "some" detailed tasks is not inconsistent with a moderate limitation in that area.[4]  That is, nothing in the record indicates the ALJ's view that such a limitation reduces plaintiff's ability with respect to detailed tasks from "all" to only "some" is unreasonable.  The same is true in regard to the restriction to no extensive social interaction and moderate limitations in the ability to get along with co-workers and peers and interact appropriately with the public.  On the other hand, plaintiff is correct in noting the ALJ gave no reasons, other than the fact that she simply disagreed therewith, for not adopting the moderate limitations on completing a normal workday and workweek, performing at a consistent pace, and maintaining attention and concentration.  To this extent, therefore, the ALJ erred.

III.     The ALJ's Step Three Analysis Was Proper

At step three of the sequential disability evaluation process, the ALJ must evaluate the claimant's impairments to see if they meet or equal any of the impairments listed in 20 C.F. R. Part 404, Subpart P, Appendix 1 (the "Listings"). 20 C.F.R § 404.1520(d); Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999).  If any of the claimant's impairments meet or equal a listed impairment, he or she is deemed disabled. Id.  The burden of proof is on the claimant to establish he or she meets or equals any of the impairments in the Listings. Tacket, 180 F.3d at 1098.

A mental or physical impairment "must result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. § 404.1508.  It must be established by medical evidence "consisting of signs, symptoms, and laboratory findings." Id.  An impairment meets a listed impairment "only when it manifests the specific findings described in the set of medical criteria for that listed impairment." SSR 83-19, 1983 WL 31248 *2.  An impairment equals a listed impairment "only if the medical findings (defined as a set of symptoms, signs, and laboratory findings) are at least equivalent in severity to the set of medical findings for the listed impairment." Id. at *2.  However, "symptoms alone" will not justify a finding of equivalence. Id.

Plaintiff argues the VA's rating decision and award of unemployability benefits and the medical opinion source evidence discussed above supports an outright award of benefits under 20 C.F. R. Part 404,

---

[4]Initially the ALJ found plaintiff capable of performing detailed tasks (Tr. 17), but then later on found he was capable of performing only "some" detailed tasks (Tr. 20).  Regardless of which finding the ALJ actually intended to make in her decision, the undersigned shall attribute the latter finding to the ALJ, as it more accurately reflects the findings made by Dr. Houck and Dr. Lewis, and the evidence in the record overall, as explained above.

Subpart P, Appendix 1, § 12.06.  With respect to whether or not plaintiff's impairments met or equaled the criteria of Listing 12.06, the ALJ found as follows:

> The undersigned has specifically considered section 12.06, concerning anxiety disorders . . . The criteria of section 12.06 require medical documentation of certain symptoms of anxiety.  These symptoms are: generalized persistent anxiety; <u>or</u> a persistent irrational fear and resulting avoidance of a specific object, activity or situation; <u>or</u> recurrent severe panic attacks occurring on the average of at least once per week; <u>or</u> recurrent obsessions or compulsions resulting in marked distress; <u>or</u> recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress.  Furthermore, these symptoms must result in (B) at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation, each of extended duration.  Alternatively (C), there must be medical documentation of a complete inability to function outside the area of one's home.  In this case the claimant has failed to demonstrate the marked level of impairment described in (B) or any of the special situations described in (C).

Tr. 16.

Plaintiff makes no specific challenge to any of the particular findings the ALJ made with respect to Listing 12.06, nor does he provide any explanation for why he asserts the VA's rating decision and award of employability or the medical source opinion evidence in the record supports a finding of disability under step three of the sequential disability evaluation process.  Perhaps that is because he cannot do so, and such evidence does not support his position on this issue.  Indeed, the undersigned finds nothing in the record to support that position, including the VA's findings.  There is no indication that the VA ever considered, let alone was aware of, the criteria for meeting Listing 12.06, or based their determination of unemployability thereon.  Further, as clearly can be seen from the above discussion, the medical opinion source evidence in the record also hardly supports plaintiff's position here.  Accordingly, the undersigned finds such position to be competely without merit.

IV.    The ALJ Erred in Failing to Consider the Lay Witness Evidence in the Record

Lay testimony regarding a claimant's symptoms "is competent evidence that an ALJ must take into account," unless the ALJ "expressly determines to disregard such testimony and gives reasons germane to each witness for doing so." <u>Lewis v. Apfel</u>, 236 F.3d, 503, 511 (9th Cir. 2001).  An ALJ may discount lay testimony if it conflicts with the medical evidence. <u>Id.</u>; <u>Vincent v. Heckler</u>, 739 F.2d 1393, 1395 (9th Cir. 1984) (proper for ALJ to discount lay testimony that conflicts with available medical evidence).  In rejecting lay testimony, the ALJ need not cite the specific record as long as "arguably germane reasons" for dismissing the testimony are noted, even though the ALJ does "not clearly link his determination to

1  those reasons," and substantial evidence supports the ALJ's decision. Lewis, 236 F.3d at 512.  The ALJ

2  also may "draw inferences logically flowing from the evidence." Sample, 694 F.2d at 642.

3       Plaintiff argues that nowhere in her decision did the ALJ discuss the lay evidence in the record

4  from his wife and mother.  That evidence consists of statements and answers to questions provided by

5  these two lay witnesses concerning their observations of plaintiff's symptoms and limitations. See Tr. 94-

6  103, 145-47.  This is competent evidence the ALJ is required to address, and provide germane reasons for

7  rejecting with respect thereto.  The ALJ did not do so, and to that extent she erred.[5]  The undersigned does

8  not agree, however, with plaintiff's contention that the nature of the lay evidence the ALJ failed to

9  properly consider requires an outright award of benefits.  Plaintiff makes no argument as to why he

10 believes that evidence in itself clearly establishes his disability and entitlement to benefits.  Indeed, in light

11 of the medical opinion source evidence discussed above, such a conclusion is entirely premature.

12 V.    The ALJ's Assessment of Plaintiff's Residual Functional Capacity

13      If a disability determination "cannot be made on the basis of medical factors alone at step three of

14 the evaluation process," the ALJ must identify the claimant's "functional limitations and restrictions" and

15 assess his or her "remaining capacities for work-related activities." SSR 96-8p, 1996 WL 374184 *2.  A

16 claimant's residual functional capacity assessment is used at step four to determine whether he or she can

17 do his or her past relevant work, and at step five to determine whether he or she can do other work. Id.  It

18 thus is what the claimant "can still do despite his or her limitations." Id.

19      A claimant's residual functional capacity is the maximum amount of work the claimant is able to

20 perform based on all of the relevant evidence in the record. Id.  However, a claimant's inability to work

21 must result from his or her "physical or mental impairment(s)." Id.  Thus, the ALJ must consider only

22 those limitations and restrictions "attributable to medically determinable impairments." Id.  In assessing a

23 claimant's residual functional capacity, the ALJ also is required to discuss why the claimant's "symptom-

24 related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the

25 medical or other evidence." Id. at *7.

26

27      [5]Defendant argues that to the extent the ALJ erred here, such error was harmless.  Where, however, "the ALJ's error lies
in a failure to properly discuss competent lay testimony favorable to the claimant, a reviewing court cannot consider the error
28 harmless unless it can confidently conclude that no reasonable ALJ, when fully crediting the testimony, could have reached a
different disability determination." Stout v. Commissioner, Social Sec. Admin., 454 F.3d 1050, 1056 (9th Cir. 2006).  Because the
undersigned cannot so conclude, the ALJ's error was not harmless.

REPORT AND RECOMMENDATION
Page - 17

1          Here, the ALJ assessed plaintiff with the following residual functional capacity:

2          [T]he claimant has the residual functional capacity to lift and carry twenty pounds
           occasionally and ten pounds frequently.  During an eight-hour day he can stand and
3          walk for six hours; and he can sit for six hours.  He can frequently do bilateral
           handling; and can do occasional kneeling, crouching, crawling and use of ladders, ropes
4          or scaffolds.  In addition, the claimant should avoid concentrated exposure to noise and
           hazardous conditions.  He is capable of performing simple and [some][6] detailed tasks
5          not involving extensive social interaction.

6   Tr. 17.  Plaintiff argues that in light of the errors he asserts the ALJ made and discussed above, her reliance

7   on this assessment of his residual functional capacity to deny him benefits is precluded.  The undersigned

8   agrees that due to the errors the ALJ made in evaluating the VA's rating decision, the findings and

9   opinions of Drs. Monkarsh, Houck and Lewis, and the lay evidence in the record, it was improper for her

10  to rely on the residual functional capacity with which she assessed plaintiff, as it is not clear that it

11  completely and accurately describes all of plaintiff's mental functional limitations.

12  VI.    This Matter Should Be Remanded for Further Administrative Proceedings

13         The Court may remand this case "either for additional evidence and findings or to award benefits."

14  Smolen, 80 F.3d at 1292.  Generally, when the Court reverses an ALJ's decision, "the proper course,

15  except in rare circumstances, is to remand to the agency for additional investigation or explanation."

16  Benecke v. Barnhart, 379 F.3d 587, 595 (9th Cir. 2004) (citations omitted).  Thus, it is "the unusual case in

17  which it is clear from the record that the claimant is unable to perform gainful employment in the national

18  economy," that "remand for an immediate award of benefits is appropriate."  Id.

19         Benefits may be awarded where "the record has been fully developed" and "further administrative

20  proceedings would serve no useful purpose."  Smolen, 80 F.3d at 1292; Holohan v. Massanari, 246 F.3d

21  1195, 1210 (9th Cir. 2001).  Specifically, benefits should be awarded where:

22         (1) the ALJ has failed to provide legally sufficient reasons for rejecting [the claimant's]
           evidence, (2) there are no outstanding issues that must be resolved before a
23         determination of disability can be made, and (3) it is clear from the record that the ALJ
           would be required to find the claimant disabled were such evidence credited.
24
25  Smolen, 80 F.3d 1273 at 1292; McCartey v. Massanari, 298 F.3d 1072, 1076-77 (9th Cir. 2002).  Because

26  issues still remain regarding plaintiff's residual functional capacity, and, by implication, his ability to do

27  other work existing in significant numbers in the national economy, this matter should be remanded to the

28
    _____
         [6]As discussed above, the undersigned finds this portion of the ALJ's assessment of plaintiff's residual functional capacity
    should read be read as "some detailed tasks."  See Tr. 20.

REPORT AND RECOMMENDATION
Page - 18

1    Commissioner for further administrative proceedings.

2         Plaintiff argues that crediting the VA's rating decision and award of unemployability benefits and

3    the medical opinion source and lay witness evidence in the record, an outright award of benefits should be

4    ordered.  However, while the ALJ did err in evaluating the VA's rating decision, it is not at all clear that

5    the ALJ would be required to equate that decision with entitlement to disability benefits under the Social

6    Security rules and regulations.  First, as discussed above, plaintiff has not shown the VA's rating decision

7    established plaintiff should have been found disabled under Listing 12.06. Second, also as discussed

8    above, "a VA rating of disability does not necessarily compel the SSA to reach an identical result."

9    McCartey, 298 F.3d at 1076 (citing 20 C.F.R. § 404.1504).  Thus, because "the criteria applied by the two

10   agencies" are not identical, "[a] VA rating of total and permanent disability is not legally binding on the

11   Commissioner." Chambliss, 269 F.3d at 522.

12        In defining the term "individual unemployability," for example, the VA uses the term

13   "substantially gainful occupation." 38 C.F.R. § 4.16(a), (b).  Section 4.16 further reads in relevant part:

14        (a) Total disability ratings for compensation may be assigned, where the schedular
          rating is less than total, when the disabled person is, in the judgment of the rating
15        agency, unable to secure or follow a substantially gainful occupation as a result of
          service-connected disabilities

16
          (b) It is the established policy of the Department of Veterans Affairs that all veterans
17        who are unable to secure and follow a substantially gainful occupation by reason of
          service-connected disabilities shall be rated totally disabled.

18
19   The VA regulations concerning disability ratings, however, do not define the term "substantially gainful

20   occupation."  Thus, it is not at all clear "substantially gainful occupation" has the meaning "substantial

21   gainful activity" does in the Social Security disability context.[7]

22        The term  "disability" is defined in the Social Security Act to mean the inability to "to engage in

23   any substantial gainful activity by reason of any medically determinable physical or mental impairment

24   which can be expected to result in death or which has lasted or can be expected to last for a continuous

25   period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  The VA regulations concerning disability

26
27        [7]In contrast, "substantial gainful activity" is defined "as work that 'involves doing significant physical or mental activities'
     and 'is the kind of work usually done for pay or profit.'" Soria v. Callahan, 16 F. Supp.2d 1145, 1149 (C.D. Cal. 1997) (quoting
28   20 C.F.R. § 416.972(a), (b)).  Work may be substantial "even if it is done on a part-time basis.'" Id. (quoting Byington v. Chater,
     76 F.3d 246, 250 (9th Cir. 1996)). It is gainful "if it is the kind of work usually done for pay or profit, whether or not a profit is
     realized." Id. at 1150 (quoting 20 C.F.R. §§ 404.1572(b), 416.972(b)).

REPORT AND RECOMMENDATION
Page - 19

ratings provide that an individual will be considered "unemployable" under the following circumstances:

> [U]pon termination of employment which was provided on account of disability, or in which special consideration was given on account of the same, when it is satisfactorily shown that he or she is unable to secure further employment.

38 C.F.R. § 4.18 (emphasis added).  Thus, it seems that, unlike in the Social Security context, an individual may be deemed "unemployable" if he or she cannot find employment. See 20 C.F.R. § 404.1566(a) (work exists in national economy for step five disability evaluation purposes when it exists in the region where claimant lives or in several other regions, regardless of whether it exists in claimant's immediate area, there are specific job vacancies open, or claimant would be hired if he or she applied).

Similarly, the VA regulations concerning disability ratings also state that "[t]otal disability ratings for compensation may be assigned" if the "disabled person is . . . unable to secure or follow a substantially gainful occupation as a result of service-connected disabilities." 38 C.F.R. § 4.16(a) (emphasis added); see also 38 C.F.R. § 4.16(b) ("[A]ll veterans who are unable to secure and follow a substantially gainful occupation by reason of service-connected disabilities shall be rated totally disabled.") (emphasis added). In addition, those regulations provide that the disability rating:

> is based primarily upon the average impairment in earning capacity, that is, upon the economic or industrial handicap which must be overcome and not from individual success in overcoming it.

38 C.F.R. § 4.15 (emphasis added).  "Total disability" also "will be considered to exist when there is present any impairment of mind or body which is sufficient to render it impossible for the average person to follow a substantially gainful occupation." Id.  On the other hand, in the Social Security context, a determination of disability clearly requires the individual claimant to be unable work based on his or her medically determinable impairments. See, e.g., 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1520.

The medical opinion source evidence in the record, furthermore, as discussed above hardly supports a finding of disability and outright award of benefits.  The same is true with respect to the evidence in the record from the two lay witnesses,[8] particularly in light of the medical opinion evidence in

---

[8]It is true that where lay witness evidence is improperly rejected, that testimony may be credited as a matter of law. See Schneider v. Barnhart, 223 F.3d 968, 976 (9th Cir. 2000) (finding that when lay evidence rejected by ALJ is given effect required by federal regulations, it became clear claimant's limitations were sufficient to meet or equal listed impairment).  As noted by the Ninth Circuit, however, the courts do have "some flexibility" in how they apply the "credit as true" rule. Connett, 340 F.3d at 876.  Further, Schneider dealt with the situation where the Commissioner failed to cite any evidence to contradict the statements of five lay witnesses regarding her disabling impairments. 223 F.3d at 976.  Here, in contrast, as discussed above, there is ample evidence in the record indicating plaintiff may not be as impaired as he, his wife and his mother have alleged.

the record and the evidence in the record concerning plaintiff's issues of credibility.  Indeed, as pointed out by defendant, plaintiff has not even challenged the ALJ's findings regarding those issues.  As such, the proper course to take in this matter is remand to the Commissioner for further proceedings.  While plaintiff requests that on remand a medical expert and vocational expert be required to testify at a new hearing, such a determination is more appropriate for the Commissioner to make as he deems necessary.

CONCLUSION

Based on the foregoing discussion, the Court should find the ALJ improperly concluded plaintiff was not disabled, and should reverse the ALJ's decision and remand this matter to the Commissioner for further administrative proceedings in accordance with the findings contained herein.

Pursuant to 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 72(b), the parties shall have ten (10) days from service of this Report and Recommendation to file written objections thereto. See also Fed. R. Civ. P. 6.  Failure to file objections will result in a waiver of those objections for purposes of appeal. Thomas v. Arn, 474 U.S. 140 (1985).  Accommodating the time limit imposed by Fed. R. Civ. P. 72(b), the clerk is directed set this matter for consideration on **October 5, 2007**, as noted in the caption.

DATED this 6th day of September, 2007.

Karen L. Strombom
United States Magistrate Judge